UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ANTONY JOSE CANELA RODRIGUEZ,<br><br>    Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, Acting Secretary, Department of Homeland Security, *et al.*,<br><br>    Defendants | No. 2:20-cv-00393-LEW |

**ORDER ON PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

In this action, Plaintiff Antony Jose Canela Rodriguez alleges that it is the practice of the United States Department of Homeland Security, through its Immigration and Customs Enforcement division, to transport alien detainees to southern states for detention pending removal proceedings, and that the alleged practice is unconstitutional in the COVID-19 era. Plaintiff filed suit in this Court shortly after his temporary placement at the Cumberland Count Jail, and has filed a Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 2) asking that the Court "bar[] Defendants from transferring Plaintiff out of CCJ until further notice." Motion at 20. Alternatively, in the face of a response stating that Defendants will transfer Plaintiff to the Franklin County House of Corrections in Massachusetts pending removal proceedings in the Hartford Executive Office for Immigration Review (EOIR), Plaintiff asks that the Court "still enter

an order prohibiting any further transfer outside of the New England states …, and requiring 48-hour advance notice of any transfer within those states." Reply at 1 (ECF No. 9). For reasons that follow, Plaintiff's Motion for Temporary Restraining Order is denied.

## BACKGROUND

Plaintiff Antony Jose Canela Rodriguez is a lawful permanent resident of the United States and a citizen of the Dominican Republic. He is also a "criminal alien" who recently "completed" a suspended term of incarceration on a felony drug trafficking conviction.[1] He is currently subject to detention by Immigration and Customs Enforcement (ICE) and is being held, temporarily, at the Cumberland County Jail in Portland, Maine. Plaintiff's wife and daughter reside in Rhode Island and are both U.S. citizens. Plaintiff has asthma, which affects his ability to breathe, and he has been diagnosed with a heart murmur. When Plaintiff has an asthma attack, he struggles to breathe and requires a nebulizer to breathe properly again.

Upon taking Plaintiff into its custody, ICE transported him to Maine where it had immediate availability of bed space. Upon arrival, he was placed in quarantine and tested for COVID-19 but he has not yet received the results of that test. Plaintiff is afraid that he could be exposed to COVID-19 if ICE transfers him to a different facility that has seen a higher number of COVID-19 cases.  The Plaintiff is particularly concerned that he will be transferred to an ICE facility in a southern state. ICE has admitted that it intended to

---

[1] On February 14, 2020, Plaintiff was convicted in New Haven, Connecticut of felony conspiracy to possess oxycodone with the intent to sell and sentenced to serve three years in prison, suspended.  Plaintiff then waived extradition to Rhode Island to face drug trafficking charges there.  On October 21, 2020, Plaintiff was released from the Adult Correctional Institute in Cranston, Rhode Island and was arrested by ICE upon his release. ICE served Plaintiff with a Notice to Appear charging removability from the United States based on his conviction of an aggravated felony.

2

transfer Plaintiff outside the New England area of responsibility. However, in reaction to the emergency motion ICE has arranged to transfer Plaintiff to a facility in Franklin County, Massachusetts, "where [he] can be housed during the pendency of his removal proceeding before the Harford Immigration Court." Declaration of Assistant Field Office Director Alan Greenbaum ¶ 20 (ECF No. 8-1). Evidently, ICE still needs to institute the proceedings, having only just taken Plaintiff into custody.

To date, there have been around eight million confirmed cases of COVID-19 in the United States resulting in roughly 216,025 deaths.[2]  COVID-19 is transmitted through contact, droplet, or airborne transmission.[3] The most common symptoms of COVID-19 are fever, tiredness, and a dry cough.  The most serious symptoms include difficulty breathing or shortness of breath, chest pain or pressure, and loss of speech or movement. Other symptoms include aches and pains, nasal congestion, headache, conjunctivitis, sore throat, diarrhea, loss of taste or smell, and a rash on the skin or discoloration of fingers or toes. [4] Complications of COVID-19 include pneumonia, respiratory failure, acute respiratory distress syndrome, acute cardiac injury, acute liver injury, acute kidney injury, clotting disorders, thromboembolic events, multiple organ failure, and death.

---

[2] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION; *Excess Deaths Associated with COVID-19, by Age and Race and Ethnicity—United States, January 26—October 3, 2020* (Oct. 20, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6942e2.htm.
[3] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION, *Scientific Brief: SARC-CoV-2 and Potential Airborne Transmission* (Oct. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.
[4] WORLD HEALTH ORG., *Coronavirus Symptoms*, (Oct. 25, 2020), https://www.who.int/health-topics/coronavirus#tab=tab_3.

According to the Center for Disease Control and Prevention (CDC), "older adults and people who have severe underlying medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19."[5] Among the conditions that may place individuals at an increased risk for severe illness caused by COVID-19 are heart conditions and moderate-to-severe asthma.[6] There is currently no vaccine for COVID-19 available in the United States. The scientific community has agreed that wearing a mask, social distancing, and frequently washing your hands with soap and hot water are the most effective measures to prevent the spread of COVID-19.[7] Once someone has contracted the virus, however, they are advised to self-quarantine and avoid all contact with others for fourteen days.[8]

Upon detention of an alien subject to removal, ICE houses the detainee in a local jail or prison where the detainee is likely to remain throughout the course of removal proceedings unless he is granted a bond. The removal process is not necessarily a speedy one, which means that detainees can remain in ICE facilities for extended periods of time. In the New England area, ICE utilizes the following facilities to house its detainees: Strafford County Corrections in New Hampshire, Wyatt Detention Facility in Rhode

---

[5] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION, *COVID-19: Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).
[6] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION, *COVID-19: People with Certain Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated October 6, 2020).
[7] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION, *COVID-19: How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated Sept. 11, 2020).
[8] U.S. CTRS. FOR DISEASE CONTROL & PREVENTION, *COVID-19: When to Quarantine*, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html (last updated Sept. 10, 2020).

Island, Plymouth County Correctional Facility in Massachusetts, Bristol County Detention Center in Massachusetts, Franklin County House of Corrections in Massachusetts, and the Cumberland County Jail in Maine.

The Plaintiff alleges that ICE has historically only used CCJ to house detainees who have been arrested in Maine and would then be transferred to other facilities within New England for removal proceedings. According to Plaintiff, around June 2020, ICE—in a dramatic shift in its transfer practices—began to increasingly transfer detainees at CCJ to southern states where detention facilities are having more difficulty, allegedly, handling COVID-19. Plaintiff alleges that, despite guidance from within ICE to limit transfers when possible,[9] ICE implemented its new practices in order to evade procedural protections afforded to detainees by federal courts in New England and is engaged in a form of forum shopping that exposes detainees to an unacceptable risk of contracting COVID-19.

Plaintiff presents affidavits of detainees transferred by ICE from facilities in the Northeast to facilities in southern states. The affidavits describe unsanitary conditions; a lack of social distancing on planes, vans, and buses; several stops along the journey; and at best intermittent mask wearing. Further, detainees claim that they were often transported through more than one facility before reaching their final destination. Similar to the planes and vans on which they traveled, the detainees claim that the facilities they were processed through were unsanitary and lacked basic necessities to prevent the spread of the virus.

---

[9] U.S. IMMIGRATION & CUSTOMS ENF'T, *COVID-19 Pandemic Response Requirements*, at 19 (Sept. 4, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

Finally, detainees allege they were sometimes forced to comingle with people who had recently been arrested on criminal charges and had not been tested for COVID-19.

According to Mr. Greenbaum, within the Boston area of responsibility, which includes Maine, ICE has established video teleconference capabilities and relationships that coordinate video proceedings with Boston and Hartford immigration courts. To date, these capabilities and relationships have not been developed at the Cumberland County Jail and ICE has relied on the Cumberland County Jail as a "short-term, overflow holding facility" where it typically holds aliens for no more than a few days before transferring them to another detention facility. Greenbaum Decl. ¶ 8. Although it is undisputed that Cumberland County Jail could in theory install additional videoconferencing equipment and task its personnel to facilitate immigration proceedings during the COVID era, the way Cumberland County Jail currently does for state and federal judicial proceedings, at present ICE and Cumberland County Jail have not deemed it necessary to establish that relationship.

## DISCUSSION

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World*, *Inc. v. MDTV Med. News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party

seeking injunctive relief, Plaintiff bears the burden of establishing that the factors weigh in his favor. *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat*, *Inc*., 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). The showing required of the party with the burden to show the likelihood of success may in some cases be reduced depending on the significance of the remaining preliminary injunction factors. *Cf. Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).[10] However, if the party fails to make a persuasive showing of likelihood of success, then generally he will lose the motion. *Cf. New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

A.   LIKELIHOOD OF SUCCESS

Plaintiff's Complaint advances one count: a claim for "reasonable safety" based on the Fifth Amendment Due Process Clause. Plaintiff asks the Court to declare that the

---

[10] *See also League of Women Voters of the United States v. Newby,* 838 F.3d 1, 6-7 (D.C. Cir. 2016) (applying the "sliding scale approach to weighing the four preliminary injunction factors"); *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017), as amended (June 26, 2017); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 37–38 (2d Cir. 2010).

transfer of Plaintiff to any ICE detention facility or any other state facility that has a contract with the Department of Homeland Security would violate his rights because of the heightened risk of exposure to COVID-19. Through the Motion for Temporary Restraining Order, Plaintiff asks that I immediately enjoin any such transfer and deprive ICE of further custodial responsibility over Plaintiff until such time as he may be needed for immigration proceedings. Evidently, Plaintiff will ask that I dictate if, when, where, and how he will be transported or held while he awaits immigration proceedings. According to Plaintiff, I am to do this to safeguard Plaintiff's right to "substantive due process." Motion at 14, 18.

I am persuaded that the likelihood of success inquiry turns on Plaintiff's ability to demonstrate at an eventual hearing that the Defendants' transportation or detention of his person outside of Maine would be done merely to punish him or for some other reasons that serves no rational end, such that Defendants can be deemed to act, under the special circumstance of the COVID-19 outbreak, in an arbitrary and capricious manner. However, although I am reasonably comfortable about the standard I should apply, I am not persuaded by the content of the record that Plaintiff is likely to make the required showing.

The basic principle that informs this case is simple. "Prison officials [and similar custodians] have a duty to provide humane conditions of confinement; [they] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Giroux v. Somerset Cnty.*, 178 F.3d 28, 31 (1st Cir. 1999) (citations and quotation marks omitted). Whether the right to humane conditions of confinement is considered in terms of the Eighth Amendment prohibition against cruel and unusual punishment (as might apply if Plaintiff is a "criminal

8

alien" under federal law) or the Fifth Amendment Due Process standard, which requires the government to refrain from inflicting "punitive measures" against a mere "detainee" not yet convicted of a crime, *Bell v. Wolfish*, 441 U.S. 520, 537 (1979) (applying the Due Process Clause), it is well established that the Constitution imposes a legal obligation on custodians to spare their wards "conditions posing a substantial risk of serious harm" and to take "reasonable measures" to mitigate unacceptable risks to health and safety. *Farmer v. Brennan*, 511 U.S. 825, 828, 832 (1994) (applying Eighth Amendment and quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).[11]

---

[11] As Magistrate Judge Nivison explained in a pretrial detainee, prisoner-transport context:

> The First Circuit has described a pretrial detainee's liberty interest in non-punitive conditions of confinement as "coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment." *Surprenant v. Rivas*, 424 F.3d 5, 18 (1st Cir. 2005). Conditions are thus punitive if they are below the "minimal measure of necessities required for civilized living." *Id.* To prove certain conduct constitutes punishment, a pretrial detainee must present "only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015).

*Salcedo v. King*, No. 2:18-CV-00092-DBH, 2018 WL 1737941, at *2 (D. Me. Apr. 11, 2018), *report and recommendation adopted*, No. 2:18-CV-92-DBH, 2018 WL 2123610 (D. Me. May 8, 2018). *See also Ford v. Bender*, 768 F.3d 15, 24 (1st Cir. 2014):

> Punishment in the present context, however, is a term of art. What is prohibited is "punishment in the constitutional sense," not mere "restrictions and conditions accompanying pretrial detention." *Bell*, 441 U.S. at 538, 99 S.Ct. 1861. In *Bell*, the plaintiffs challenged their general conditions of confinement, such as the practice of double bunking detainees and restrictive rules on receiving packages from outside the facility. The Supreme Court declared in *Bell* that the test of whether a condition is in fact punishment is whether "the disability is imposed for the purpose of punishment." *Id.* A punitive purpose may be demonstrated through either expressed intent or through inference, for example if a rule or regulation is disproportionate to, or not reasonably related to, a legitimate, non-punitive goal. *Id.* at 538–39, 99 S. Ct. 1861; *see also Surprenant*, 424 F.3d at 13.

When asked to evaluate a claim of this kind, a court asks first whether the health and safety risk raised in the complaint is, from an objective perspective, sufficiently serious to call into question the existence of humane conditions of confinement. If the answer is yes, the court will next evaluate whether the evidence shows that the defendant has "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. And when, as here, a court is asked to enjoin or compel executive action in the interest of health and safety and in relation to a risk well known to all, then unless the evidence suggests that the executive is taking or refraining from taking action for the very purpose of inflicting harm, the court must evaluate the executive's conduct based on the standard of objective reasonableness, as articulated in *Farmer*.[12]

I am also mindful that inadequacies in Plaintiff's showing should not be ignored for the sake of choosing sides in a political turf war because, as recognized by the Supreme Court in *Bell* and other opinions, there is a basic separation-of-powers understanding that federal courts are not in the business of administering immigration detention facilities and micromanaging detainee transportation decisions.

---

[12] This conclusion may be overly favorable to Plaintiff, who appears to have the status of a "criminal alien." 8 U.S.C. § 1226(c). Given this status, it may be the case that a merely "punitive" condition would not offend the Constitution. Even setting aside Plaintiff's status as a criminal alien, alienage alone may point to the Eighth Amendment standard given that detained aliens do not stand in the same shoes, under the Constitution, as detained citizens. *Demore v. Kim*, 538 U.S. 510, 521–22 (2003). Nevertheless, because we are at bottom dealing with a matter of basic human decency, I have considered the issue using a reasonableness standard rather than the deliberate indifference, subjective standard. After all, even under the Eighth Amendment, which in theory is more tolerant of risk, "[t]he basic concept … is nothing less than the dignity of man," which is measured against "the evolving standards of decency that mark the progress of a maturing society," which in turn "should be informed by objective factors to the maximum possible extent.'" *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002) (quoting, respectively, *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958), and Justice White's plurality opinion in *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed [the] warning that "[such] considerations are peculiarly within the province and professional expertise of [executive] officials, and in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979) (quoting *Pell v. Procunier*, 427 U.S. at 827 (first and third alteration my own)).

As to the first due process question, I recognize that COVID-19 raises new concerns from a public health standpoint and that a failure to adapt policies and procedures to that concern might warrant federal court interference with ICE's transportation and detention decisions. However, I am not persuaded by Plaintiff's showing that he will likely demonstrate that Defendants' transportation and detention of <u>him</u>[13] *into and within the Boston region*, *for Hartford-based immigration proceedings* runs a risk so significant that Plaintiff's constitutional rights are jeopardized. On this issue, the record includes evidence that ICE's transportation and detention protocols do offer some protection against transmission, including masks, social distancing, and tests, and I do not see in the record any evidence that infection or transmission rates in Massachusetts detention centers are so high that a federal court should enjoin Plaintiff's reintroduction into that community of detained persons. Moreover, Defendants have stated that they intend to hold Plaintiff at the Franklin County Jail in Massachusetts pending removal proceedings at the Hartford Executive Office of Immigration Review. That does not strike me as unnecessarily

---

[13] This case is about Defendants' treatment of Plaintiff and I therefore assess the merits on that basis.

11

hazardous to Plaintiff's health and safety. There is no evidence to suggest that this detention facility poses a significant risk to Plaintiff's health.

My initial conclusion as to the nature of the hazard itself is enough to end the inquiry and deny Plaintiff's motion for temporary restraining order. But in the interest of a complete analysis, I will address the remaining element of the due process claim, as well as the remaining TRO considerations.

As for the objective reasonableness inquiry, I conclude that Plaintiff is not likely to demonstrate that Defendants' transportation and detention of his person within the Boston region lacks a rational basis. Plaintiff is a resident of Rhode Island who will be subject to immigration proceedings based in Hartford. Under the circumstances, it is perfectly reasonable for Defendants to hold Plaintiff in a detention facility in which there is a regular practice of coordinating remote hearings with immigration court officials and personnel. I understand that the Cumberland County Jail has the technical wherewithal to facilitate an immigration hearing. However, administrative agencies should be permitted to rely on facilities with which they regularly conduct proceedings and I do not see any momentous cause for me to order ICE, let alone the Cumberland County Jail, to take on that task.

**B.     IRREPARABLE INJURY**

To justify a temporary restraining order, Plaintiff must show he will suffer irreparable injury. "'Irreparable injury' … means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Infection with COVID-19, or any disease for that

matter, is serious business. However, because I conclude that Plaintiff is not likely to demonstrate that reintroduction to the Massachusetts-based community of detained persons is inhumane or otherwise unreasonable, I likewise find that the prospect of irreparable injury is not great enough or imminent enough to justify temporary injunctive relief.

### C. BALANCE OF EQUITIES AND PUBLIC INTEREST

The final two factors require that Plaintiff demonstrate that the balance of the relevant equities tips in his favor, *Arborjet*, 794 F.3d at 171, and that the award of an injunction would not ride roughshod over relevant public interests. *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005).

Plaintiff has addressed these concerns in tandem, and I will follow his lead. Like Plaintiff, the public has an interest in avoiding outbreaks in populations of detained aliens, whether those persons are subject to mandatory detention following a sentence of incarceration or are being detained to ensure their appearance at removal proceedings. However, the public also has an interest in letting executive functions be conducted by the Executive Branch, without having an unelected judge with no expertise in the detention of alien populations attempt to decide whether and, if so, when and where, a detainee can be moved in connection with immigration proceedings, especially when those immigration matters will necessarily take place outside the judge's venue and when the record does not demonstrate that the risk of placing Plaintiff at the intended detention facility is unduly hazardous or irresponsible, or otherwise irrational.

## CONCLUSION

Plaintiff's Motion for Temporary Restraining Order (ECF No. 2) is **DENIED**. Following Plaintiff's anticipated transfer, the Court will hear the parties further on the issue of whether the case should be dismissed without prejudice or transferred to the District of Massachusetts.

**SO ORDERED.**

Dated this 26th day of October, 2020.

                                                  /s/ Lance E. Walker
                                           UNITED STATES DISTRICT JUDGE